Moore, Petitioner, *v.* Jamieson.

300

Argued January 16, 1973. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*Isaiah W. Crippins,* for petitioner.

*Martin H. Belsky,* Assistant District Attorney, for respondents.

*Lynwood F. Blount,* for intervenor, Pennsylvania Conference of State Trial Judges.

*David Rudovsky,* with him *Peter Hearn, Kairys & Rudovsky,* and *Pepper, Hamilton & Scheetz,* for amicus curiae, American Civil Liberties Union.

OPINION BY MR. JUSTICE NIX, March 19, 1973:

The petitioner, Cecil B. Moore, Esq., a member of the bar of Pennsylvania whose practice consists chiefly of representing criminal defendants in the City of Philadelphia, seeks a writ of prohibition against the enforcement of Rule *301 of the Philadelphia Court of Common Pleas. That rule[1] prohibits an attorney who represents ten or more criminal defendants whose indictments are over twelve months old from entering an appearance in any additional criminal cases.[2] On De-

---

[1] For editorial purposes, we will refer to *301 as a rule. In so doing we do not purport to decide the issue of whether Pa. R. Crim. P. 1(c) as it existed prior to April 26, 1972, required the submission of *301 to the Criminal Procedural Rules Committee of this Court.

[2] Rule *301, as it was lodged with the Criminal Procedural Rules Committee of this Court on July 5, 1972 pursuant to the present Pa. R. Crim. P. 1(c) provides:

"Counsel representing ten or more defendants against whom indictments have been outstanding for a period in excess of twelve months, whether or not all pre-trial motions have been determined and regardless of the date of entry of counsel's appearance, shall not be entitled to enter an appearance or in any other manner represent any additional defendant or defendants in any criminal court in this County until such time as all defendants represented by such counsel, whose indictments have been outstanding more than twelve months, have been tried or the charges dismissed. It shall be the duty of the Court Administrator, after the close of the previous criminal term of Court of each month, to furnish all Judges of this County with a list of attorneys who on the first day of that month represent ten or more defendants whose indictments have been outstanding more than twelve months and the names of said defendants. Priority status shall be given to all such

cember 13, 1972, we granted an order of supersedeas pending the disposition of this petition.

By way of procedural history, Rule *301 was originally promulgated[3] in Administrative Memorandum No. 69-60, on August 13, 1969, by the Honorable Vincent A. Carroll, then President Judge of the Court of Common Pleas, Philadelphia County, pursuant to the Act of June 21, 1937, P. L. 1982, §2, as amended, 17 P.S. §62[4] and Pa. R. Crim. P. 1(b)[5]. In an affi-

---

cases which must be tried before counsel is again eligible to enter an appearance for defendants in other criminal cases. Any dispute concerning the accuracy of the list prepared by the Court Administrator shall be determined forthwith by the President Judge of the Common Pleas Court upon application by counsel. Upon good cause shown, the President Judge may relieve counsel from compliance with the foregoing rule.

"Where counsel has one or more partners or associates in the practice of law, entries of appearance by said partners or associates shall not be considered in determining the defendants represented by counsel whose indictments exceed the prescribed time. In no event shall substitution of appearances be permitted by counsel where such substitution is to avoid compliance with this rule. Defendants who are fugitives or whose cases are in deferred status by reason of incompetency or other good and sufficient reason, shall not be included in determining the number of defendants whose indictments have been outstanding for a period in excess of twelve months."

[3] The original version of the rule differed from the present rule only in the provisions of its first paragraph, which were as follows: "Counsel representing fifteen or more defendants against whom indictments have been outstanding for a period in excess of twelve months, whether or not all pretrial motions have been determined and regardless of the date of entry of counsel's appearance, shall not be entitled to enter an appearance or in any other manner represent any additional defendant or defendants in any criminal court in this County until such time as the number of untried defendants represented by such counsel whose indictments have been outstanding for more than twelve months shall be reduced to a number less than fifteen. . . ."

[4] That statute provides:

"Local rules by lower courts

davit executed on May 8, 1970, Edward J. Blake, Esq., who was then serving in the capacity of Court Administrator of the Court of Common Pleas, Philadelphia County, alleged that as of that date, the petitioner "had entered his appearance on behalf of fifty-six (56) criminal defendants who as of this date have been indicted but untried for more than one year's time. . . ." The affidavit further alleged that as of that date, Mr. Moore had entered an appearance on behalf of eighty-seven (87) other criminal defendants and that a special "Priority Program" had been instituted to expedite the disposition of petitioner's cases. On May 15th of the same year, an order was entered by the then President Judge for Philadelphia County prohibiting respondent, under the rule, from entering any further appearances in that county "until such time as the number of untried defendants represented by Mr. Moore, whose indictments have been outstanding for more than twelve (12) months, shall be reduced to a number less than fifteen (15)." On August 9, 1971, Petitioner was adjudged to be in compliance with Rule *301 and he was again permitted to enter appearances in criminal cases in Philadelphia County.

Thereafter, on November 9, 1971, the District Attorney of Philadelphia County filed a petition in the Court of Common Pleas of Philadelphia County requesting that Rule *301 be reinvoked against petitioner. After

---

"Each of the courts of common pleas, each of the courts of quarter sessions, the county court of Allegheny County, the municipal court of Philadelphia, and other courts established by the General Assembly, may adopt additional local rules for the conduct of its business, which shall not be inconsistent with or in conflict with said general rules prescribed by the Supreme Court of Pennsylvania."

[5] That rule provides: "(b) Each of the courts exercising criminal jurisdiction may adopt local rules of procedure which shall not be inconsistent with or in conflict with these rules."

responsive pleading was filed by petitioner and an extensive hearing held before the Court Administrator, a report was filed on February 7, 1972 by Judge BLAKE,[6] the pertinent portion of which is set forth below.

"After careful review of the appropriate computer printouts and the notes of testimony of the administrative hearing, we conclude:

"1. That Cecil B. Moore, as of February 2, 1972, has appearances entered in 99 criminal cases, and that as of that date 32 of such cases are more than one year old.

"2. That the inability of the District Attorney to proceed on scheduled trial dates in some of these cases, while a contributing factor to delay, is not a substantial cause.

"3. That *Rule 301 is an absolute bar to an attorney entering additional appearances, when the number of cases more than one year old, in which he represents defendants, exceeds ten, and takes into consideration the fact that the Commonwealth's inability to proceed on scheduled trial dates may be a contributing factor.

"4. That Mr. Moore's inability to dispose of his cases now more than one year old will be aggravated by the fact that 47 additional cases will become more than one year old by June 30, 1972.

"Accordingly it is recommended that:

"(a) *Rule 301 be reinvoked against respondent, Cecil B. Moore;

"(b) Administrative procedures be structured to insure trial of those cases now more than one year old, numbering 33, and those cases which will become more

---

[6] Between the time of the hearing and the date of the report, Mr. Blake was appointed to the Court of Common Pleas for Philadelphia County. He continued to serve in the capacity of Court Administrator.

than one year old, numbering 47, prior to June 30, 1972." (Footnote omitted.)[7]

On February 9, 1972 an order was entered by President Judge JAMIESON reinvoking the provisions of the rule against petitioner and providing that he shall not be allowed to enter any further appearances "until such time as the number of untried defendants . . . whose indictments have been outstanding for more than twelve (12) months, shall be reduced to a *number less than 10*".[8]

Petitioner than filed suit in the Federal court seeking relief. The action was dismissed on the grounds of lack of jurisdiction over the subject matter. *Moore v. Carroll*, 315 F. Supp. 1129 (E.D. Pa. 1970), decided July 28, 1970. On April 30, 1971, Moore filed a second complaint in the Federal court, motions to dismiss were filed and subsequently granted on August 31, 1971.[9] On September 13, 1972, the petitioner filed the petitions that are presently before us for a decision. Under the Appellate Court Jurisdiction Act, Section 201[10] we are

---

[7] Although the present version of Rule *301 was not lodged with the Criminal Procedural Rules Committee until July 5, 1972, see note 2, Judge BLAKE advised the parties, at the outset of the proceedings, that they were proceeding under the present version of the rule. No objection was raised at that time by petitioner.

[8] While the rule provides that the sanction can remain in effect until all of the cases where indictments have been outstanding for more than 12 months have been disposed of, Judge JAMIESON's order merely required petitioner to reduce the number of outstanding cases in excess of one year to less than 10. We therefore will not consider those objections that have been raised with respect to the broader prohibition suggested by the present version of the rule.

[9] This case was not reported. A related case involved four prospective clients of Mr. Moore, who complained that the rule prevented them from receiving his services. Their case, also instituted in the Federal Court, was dismissed. *Stanson v. Carroll*, 316 F. Supp. 484 (E.D. Pa. 1970), decided July 28, 1970.

[10] 1970, July 31, P. L. 673, Art. II, §201, 17 P.S. §211.201 (1972-73 Supp.).

given original but not exclusive jurisdiction over all cases of prohibition to courts of inferior jurisdiction. In view of the impact of these questions upon the lower courts in their administrative responsibilities, we have accepted original jurisdiction in this matter.[11]

Petitioner's brief raises three constitutional objections to Rule *301: (1) The rule unnecessarily restricts the right of criminal defendants to counsel of their choice in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution; (2) The rule is vague, overbroad, arbitrary and capricious, in violation of the Fourteenth Amendment to the United States Constitution; (3) The rule is unconstitutional in its operation because it places an unfair burden on Black lawyers and defendants. Petitioner also contends that the District Attorney's Office has been allowed to abuse its discretion and power in initiating and implementing the invocation of this rule. The amicus limits its brief to supporting petitioner's allegation that the rule unconstitutionally infringes upon the right of criminal defendants to counsel of their own choosing. The State Trial Judges chose to rely upon the brief filed by the respondents.

We begin by considering the alleged infringement upon the right of criminal defendants to counsel of their own choosing. At the outset, we note that because the petitioner does not fall within the class of persons whose rights are thus affected, his standing to raise this issue might well be questioned. See, e.g., *Sierra Club v. Morton*, 405 U.S. 727 (1972). The doctrine of standing insures that a court will have the benefit of truly adverse parties in resolving a case. The petitioner,

---

[11] We granted a petition by the Pennsylvania State Trial Judges to intervene as party defendants, and a petition of the American Civil Liberties Union to file a brief and argue as amicus curiae.

beyond question, has standing to challenge the effect of Rule *301 upon his right to practice law. In considering such a challege, we are forced to consider the effect of the rule on the formation of an attorney-client relationship. Such an inquiry would necessarily include the right of an attorney to practice law as well as the right of an accused to counsel of his choice. The two rights are opposite sides of the same coin, and no treatment of the effect of Rule *301 on one would be adequate without examining its effect on the other. Both parties and the amicus devoted significant portions of their respective briefs to the subject, thus the basic consideration for invoking the standing doctrine is satisfied. It is also significant that respondent registered only a perfunctory one-sentence challenge to petitioner's standing. Were we to fail to reach the right to counsel's objection, it almost certainly would be raised subsequently by one with standing (see f.n. 9), thus a consideration for judicial economy would also dictate that we consider the issue. We therefore hold that no purpose would be served by allowing the question of standing to foreclose a decision on the merits of this contention.

We must begin with the unquestioned premise that, under the Sixth Amendment to the United States Constitution,[12] made applicable to the States through the Fourteenth Amendment, "the accused regardless of financial status is guaranteed the right to the assistance of counsel, *either counsel of his own choosing,* or if indigent or otherwise unable to secure counsel, counsel assigned by the court. *Gideon v. Wainwright,* [372 U.S. 335 (1963)]." (Emphasis added.) *Commonwealth ex rel. Goodfellow v. Rundle,* 415 Pa. 528, 533, 204 A. 2d 446, 448 (1964). The right to counsel of one's own choosing

---

[12] "In all criminal prosecutions, the accused shall enjoy the right to have the Assistance of Counsel for his defense."

is particularly significant because an individual facing criminal sanctions should have great confidence in his attorney. Cf. *Commonwealth v. Velasquez,* 437 Pa. 262, 265, 263 A. 2d 351, 353-354 (1970).

Similarly, the right to pursue the occupation of one's choosing is a distinguishing feature of our way of life in this country, and that right may not be curtailed without due process of law. "It is undoubtedly the right of every citizen of the United States to follow any lawful calling, business, or profession he may choose, subject only to such restrictions as are imposed upon all persons of like age, sex and condition. This right may in many respects be considered as a distinguishing feature of our republican institutions. Here all vocations are open to every one on like conditions. All may be pursued as sources of livelihood, some requiring years of study and great learning for their successful prosecution. The interest, or, as it is sometimes termed, the estate acquired in them, that is, the right to continue their prosecution, is often of great value to the possessors and cannot be arbitrarily taken from them, any more than their real or personal property can be thus taken." *Dent v. West Virginia,* 129 U.S. 114, 121-122 (1889).

We agree with the petitioner that Rule *301 has an effect on both the right of Philadelphia criminal defendants to counsel of their own choosing and upon petitioner's right to pursue his profession. Those rights, however, are not absolute, particularly in the face of the state's interest in the swift and efficient administration of criminal justice. *United States ex rel. Carey v. Rundle,* 409 F. 2d 1210 (3d Cir. 1969); *Lee v. United States,* 235 F. 2d 219 (D.C. Cir. 1956); *United States v. Hampton,* 457 F. 2d 299 (7th Cir. 1972). There are two important but related aspects to the state interest involved: (1) The Commonwealth's obligation to provide a speedy trial for the benefit of all criminal defendants.

See, e.g., *Barker v. Wingo*, 407 U.S. 514, 519 (1972); *Commonwealth v. Hamilton*, 449 Pa. 297, 297 A. 2d 127 (1972); (2) The Commonwealth's right to have criminal cases expeditiously disposed. "The right to a speedy trial is generically different from any of the other rights enshrined in the Constitution for the protection of the accused. In addition to the general concern that all accused persons be treated according to decent and fair procedures, there is a societal interest in providing a speedy trial which exists separate from, and at times in opposition to, the interests of the accused." *Barker v. Wingo*, 407 U.S. 514, 519 (1972).

It is clear we must balance conflicting rights which reach constitutional proportions in order to resolve this case. On the one hand we have the right of criminal defendants to counsel of their choice and the right of attorneys to practice criminal law. On the other, we have the state's constitutional duty to provide speedy trials and its obligation to its citizens to have criminal violations adjudicated quickly.

As the United States Court of Appeals for the Third Circuit noted:

"Desirable as it is that a defendant obtain private counsel of his own choice, that goal must be weighed and balanced against an equally desirable public need for the efficent and effective administration of criminal justice. The calendar control of modern criminal court dockets, especially in metropolitan communities, is a sophisticated operation constantly buffeted by conflicting forces. The accused's rights—such as those relating to a speedy trial, to an adequate opportunity to prepare the defense, and to confront witnesses—are constantly in potential or real conflict with the prosecution's legitimate demands for some stability in the scheduling of cases. The availability of prosecution witnesses is often critically dependent on the predicability of the trial list. That delays and postponements only increase the

reluctance of witnesses to appear in court, especially in criminal matters, is a phenomenon which scarcely needs elucidation.

"Moreover, it is not only the prosecution which may suffer from unscheduled changes in the calendar. To permit a continuance to accommodate one defendant may in itself prejudice the rights of another defendant whose trial is delayed because of the continuance. Played to an extreme conclusion, this indiscriminate game of judicial musical chairs could collapse any semblance of sound administration, and work to the ultimate prejudice of many defendants awaiting trial in criminal courts.

"This is not to say that there should be an arbitrary and inelastic calendaring of cases without due regard, for example, to the existence of conflicting demands for the service of a particular counsel by different courts or by the schedules within a multi-judge court. In judicial administration, too, there should be no absolutes. It is the trial judge who must balance the conflicting demands of court administration with the rights of the accused, conscious, however, that when he considers the rights of those accused of crime, he must consider not only those involved in the case immediately before him but also those of other defendants awaiting trial whose rights may be affected by the consequences of trial delay." *United States ex rel. Carey v. Rundle,* 409 F. 2d 1210, 1214-15 (3d Cir. 1969) (Footnote omitted).

In balancing these conflicting rights, four factors must be considered: (1) Whether the state interest sought to be achieved can be effectively accomplished in some manner which will not infringe upon interests protected by constitutional rights; (2) Whether the state interest is sufficiently compelling when compared with the interests affected, justifies any infringement of those interests; (3) Whether the state interest is suffi-

ciently compelling to justify the degree of infringement that is necessary to effectuate that interest; (4) Whether the provision under challenge represents the narrowest possible infringement consistent with effectuating the state interest involved.

## I. The Lack of a Non-Burdensome Alternative

While we recognize the state's interest in this instance to be fundamental and compelling, we must first be satisfied that these objectives cannot be attained by alternative means not requiring an infringement of constitutional rights. Unquestionably, the greater the caseload of counsel the more imminent the possibility of scheduling conflicts which may well result in delays occasioned by counsel's unavailability. An unfettered right to accept criminal cases would permit an attorney to deliberately delay cases indefinitely and completely frustrate society's interest in the expeditious disposition of criminal matters.

No one has suggested, nor have we been able to conceive of any effective method to curtail the threatened evil, other than by allowing the court a reasonable restraint over the number of cases any one attorney may have at a given time. The history of this case attests to the inadequacy of special programs to facilitate prompt disposal of cases. Before resorting to a curtailment of Mr. Moore's caseload the court below attempted to design special procedures in an effort to meet the problems caused by petitioner's extraordinarily heavy caseload. A special courtroom with judge, prosecutor and supportive staff was assigned to handle Mr. Moore's cases exclusively. The assignment of judges for this special court was made with a view of avoiding unduly protracted jury trials and plea bargaining was encouraged to generate guilty pleas. The court below is to be complimented for the conscientious effort exhibited, the

ingenuity demonstrated and the consideration shown for the interest of Mr. Moore and his clients. Yet all of these measures proved ineffective to satisfactorily resolve the problem.

Where it is obvious that it is physically impossible for counsel to dispose of the cases in which he has entered his appearance without undue delay, it would be unreasonable to suggest that the court is without power to prevent him from continuing to enter his appearances in additional matters until the condition is rectified.

## II. The Nature of the State Interest Justifies Some Infringement Upon the Rights Involved

As we have noted the state's interest in speedy trials is two-fold: To fulfill its constitutional obligation to provide all criminal defendants with speedy trials; to satisfy the public's right to have persons accused of crime tried with reasonable speed.

In July of 1969, when this rule was promulgated, Philadelphia had 8,421 untried criminal cases in the Court of Common Pleas and 3,367 of those cases were more than six months old. In Memorandum 69-60, President Judge CARROLL embarked upon a conscientious effort to bring all criminal cases to trial within six months of the indictment.

The situation has not improved significantly since 1969. In *Commonwealth v. Hamilton,* supra at 306-309, this court reviewed the criminal backlog in Philadelphia and called upon all those entrusted with the responsibility of managing court calendars to increase their efforts to assure speedy trials. Such backlogs produce intolerable tensions upon society in general, and upon the criminal justice system in particular.

"The inability of courts to provide a prompt trial has contributed to a large backlog of cases in urban

courts which, among other things, enables defendants to negotiate more effectively for pleas of guilty to lesser offenses and otherwise manipulate the system. In addition, persons released on bond for lengthy periods awaiting trial have an opportunity to commit other crimes. . . . Moreover, the longer an accused is free awaiting trial, the more tempting becomes his opportunity to jump bail and escape. Finally, delay between arrest and punishment may have a detrimental effect on rehabilitation.

"If an accused cannot make bail, he is generally confined, . . . in a local jail. This contributes to the overcrowding and generally deplorable state of those institutions. Lengthy exposure to these conditions 'has a destructive effect on human character and makes the rehabilitation of the individual offender much more difficult'. At times the result may even be violent rioting. Finally, lengthy pretrial detention is costly. The cost of maintaining a prisoner in jail varies from $3 to $9 per day, and this amounts to millions across the Nation. In addition, society loses wages which might have been earned, and it must often support families of incarcerated breadwinners." *Barker v. Wingo*, 407 U.S. at 519-21. (Footnotes omitted.) When Rule *301 is viewed in the perspective of the enormous criminal backlog in Philadelphia, it is clear that the state's interest mandates some incursion upon the rights invoked by the petitioner.

III.  The Degree of Infringement Upon the Constitutionally Protected Areas Necessary to Further Significantly the State Interest Involved

Rule *301 operates to force an attorney with more than ten cases over one year old to dispose of his old cases before accepting any additional clients. An attorney who falls within the ambit of the rule thereby

suffers an infringement on his right to practice law. While that infringement cannot be characterized as *de minimis,* it is neither permanent nor all-encompassing. The attorney in question need only dispose of his old cases to obtain relief. There is no effect upon his civil practice or his practice beyond the city boundaries.

As we have noted, courts must be permitted to regulate defense attorneys' caseloads in order to make any progress in reducing the overwhelming backlog of criminal cases. The rule's infringement of the rights here at issue has a salutary effect upon the backlog problem in two ways.

First, the rule insures that the oldest cases will be disposed of first. A chronic problem in the criminal system is that the easily disposed of cases are skimmed off the top of the backlog, leaving the older, more difficult cases to languish further behind. Cf. *Commonwealth v. Hamilton,* supra. The rule would help to alleviate this problem. By invoking the rule's requirement that *all* old criminal cases be disposed of before any new appearances may be entered, this aspect of the rule could be enhanced beyond its effect in the case at bar (see f.n. 8, supra).

Second, the infringement occasioned by the rule is necessary to insure continued efforts by all members of the bar to alleviate the backlog. It is reasonable to assume that an attorney with a heavy caseload who is not within the ambit of the rule would exercise self-restraint in order to avoid its sanction.

Petitioner argues that the number ten is arbitrary. Rather than invoke a particular number, he would judge the merits of each case. Such an analysis would be more arbitrary and time-consuming than the procedure at bar. It is often necessary to set numerical standards to insure that all possible efforts are made to bring about speedy trials. See, e.g., *Commonwealth v. Hamil-*

*ton,* supra. We cannot say that ten is an arbitrary place to draw this line.

## IV. Is the Regulation Narrowed To Protect Only the Valid State Interest Involved?

Thus, we agree with the respondent that the state's interest in these circumstances is such that a reasonable curtailment of the Sixth and Fourteenth Amendments is not constitutionally offensive. The petitioner and the amicus, however, contend that even if some regulation is permissible the instant rule as drawn is overbroad, vague and unnecessarily restrictive. We agree.

The infringement occasioned by Rule *301 may only be sustained where it is reasonably related to the reduction of the backlog. That end can be obtained, however, only where the delay in the subject attorney's cases *has been occasioned primarily by that attorney's inability to appear for cases that are otherwise ready for disposition.* Where cases remain untried for any reason or combination of reasons other than the defense attorney's inability to appear for trial, invocation of Rule *301 would have no relationship to the objective the rule was designed to meet.

On its face, Rule *301 gives every indication that it operates automatically once the stated limit of old cases has been exceeded, the only exception being defendants "who are fugitives or whose cases are in deferred status by reason of incompetency or other good and sufficient reason, . . ." While the rule permits disputes as to the accuracy of the list of year old cases, no procedure is provided to challenge the reason for the delay in any particular case. An attorney who is available and willing to proceed to trial on all of his cases could nevertheless fall within the ambit of the rule as it is presently drafted even though the delay was occasioned by the prosecution's failure to be prepared, the failure of

witnesses to appear, or by any number of other reasons that are unrelated to the attorney's availability. "Where certain 'fundamental rights' are involved, . . . legislative enactments must be drawn narrowly to express only the legitimate state interests at stake. Griswold v. Connecticut, 381 U.S. 479, 485 (1965) ; Aptheker v. Secretary of State, 378 U.S. 500, 508 (1964) ; Cantwell v. Connecticut, 310 U.S. 296, 307-308 (1940) ; see Eisenstadt v. Baird, 405 U.S. 438, 460, 463-464 (1972) (WHITE, J., concurring)." *Roe v. Wade,* 410 U.S. 113, 155 (1972). It would derrogate from the important rights involved in this case to permit their deprivation in situations where they in no way conflict with the legitimate state purpose sought to be served. The rule is thus fatally overbroad.

Nor is it a sufficient answer that the rule permits relief upon "good cause shown". Divestment of the important constitutional rights at issue here cannot be justified by a standard so vague as to be susceptible to arbitrary and inequitable interpretations. *Baggett v. Bullitt,* 377 U.S. 360, 378-79 (1964) ; *Smith v. California,* 361 U.S. 147, 150-151 (1959). Where a statute is reasonably susceptible to two interpretations, courts must presume that the Legislature intends the result that does not offend the Constitution. *American Power & Light Co. v. S.E.C.,* 329 U.S. 90 (1946). This doctrine, however, cannot be invoked to save the rule in question because the defect here is the absence of *any* standard. We are not faced with the interpretation of an ambiguous document but rather the failure of the drafters of the rule to provide any standards.

Further the rule is also defective in that it fails to provide adequate guidance to those enforcing it and those subject to it. It contains no standards as the amount of responsibility for delay necessary to make a particular case relevant for purposes of the rule's prohibition. Nor does it provide a procedure by which these

matters are to be determined. We therefore find the rule too vague and overbroad.

The writ of prohibition against the enforcement of Rule *301 of the Court of Common Pleas, Philadelphia County is hereby granted and the Court of Common Pleas, Philadelphia County, is restrained from proceeding against the petitioner under its provisions.

Mr. Chief Justice JONES and Mr. Justice ROBERTS concur in the result.

---

CONCURRING OPINION BY MR. JUSTICE MANDERINO:

I concur with the majority that Rule 301 of the Philadelphia Court of Common Pleas (see majority opinion) has no reasonable relationship to the objective the Rule was designed to meet; that the Rule provides no standards; and that the Rule is too vague and overbroad. I must add that the Rule also violates constitutional guarantees in that it does not apply to *all attorneys* appearing in the criminal courts. The Rule is specifically aimed at *defense counsel*. It has no application to *counsel for the prosecution*. The Rule is thus one-sided and an obvious violation of the petitioner's constitutional right to equal protection of the laws.

A criminal trial requires an attorney to represent the prosecution and an attorney to represent the defense. Any rule (although it is otherwise constitutional) which restricts a particular attorney in the representation of defendants but does not restrict a particular attorney in representing the prosecution raises what may be insurmountable problems under the equal protection guarantees.

Rule 301 is a *court* rule. It is not and should not be a *prosecution* rule. Certain court rules applying only to defense counsel and not to counsel for the prosecution may be valid. In the present context, however, in which the objective is to eliminate the delay of *criminal trials* by restricting representation, I fail to see any difference

between the defense and the prosecution side since both sides must be represented in a criminal trial and that requires two attorneys, one on each side.

If *counsel for the prosecution* represents the prosecution in cases involving ten or more defendants whose indictments are over a year old, I fail to see why such representation should not be prohibited in exactly the same manner that representation by defense counsel is prohibited.

The Rule also contains provisions in order to insure that an attorney who is a member of a firm does not allow his partners or associates to enter an appearance in order to avoid the Rule. I fail to see why this same prohibition should not apply to *counsel for the prosecution*. If *counsel for the prosecution* enters an appearance in a given case, substitution of other *counsel for the prosecution* should not be permitted if the purpose is to avoid compliance with the Rule.

Like the majority, I commend the effort to eliminate delays in the trial of criminal cases. A rule, however, cannot be constitutional which assumes a one-sided posture in a context which requires a two-sided posture. In the context of Rule 301, *defense counsel* is not a reasonable classification justifying restrictions which are not imposed upon *counsel for the prosecution*. In terms of appearances by attorneys for a criminal trial, the only reasonable classification for a rule would be the classification of *trial counsel* including both *defense counsel* and *counsel for the prosecution*.

Any rule designed to eliminate delay in the trial of criminal cases must not only meet the constitutional standards set forth in the majority opinion, but must also protect the petitioner's constitutional right to equal protection of the laws.