421 A.2d 190

Joan A. MATTOS, Administratrix of the Estate of Charles W. Mattos, Deceased, Petitioner,

v.

C. Fred THOMPSON, Jr., M.D., and Arthur S. Frankston, Administrator for Arbitration Panels for Health Care.

Joan A. MATTOS, Administratrix of the Estate of Charles W. Mattos, Deceased, Appellant,

v.

C. Fred THOMPSON, Jr., M.D.

Supreme Court of Pennsylvania.

Argued June 24, 1980.

Filed Sept. 22, 1980.

Stephen M. Feldman, Philadelphia, George A. Halalis, Bethlehem, for petitioner.

Boyd H. Walker, Allentown, Lewis S. Kunkel, Jr., Susan J. Forney, Arthur S. Frankston, Harrisburg, for respondents.

Robert L. Pratter, Philadelphia, for intervenor.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, LARSEN, FLAHERTY and KAUFFMAN, JJ.

## OPINION OF THE COURT

NIX, Justice.

This case presents us with a renewed challenge to the Pennsylvania Health Care Services Malpractice (Act).[1] We upheld the constitutionality of this Act in *Parker v. Children's Hospital of Philadelphia*, 483 Pa. 106, 394 A.2d 932 (1978), with the caveat that "[i]t is an accepted principle of constitutional law that deference to a coequal branch of government requires that we accord a reasonable period of . . . time to test the effectiveness of legislation." *Id.*, 483 Pa. at 121, 394 A.2d at 940.

After our decision in *Parker*, petitioner Mattos filed an action in trespass in the Court of Common Pleas of Northampton County against Dr. Thompson, respondent, seeking damages for the death of her husband allegedly resulting from the negligence of Dr. Thompson. That court dismissed the action on the ground that the Act deprived the court of subject matter jurisdiction, notwithstanding the fact that both parties were prepared for trial. Petitioner reasserted constitutional objections to the Act, and appealed to the Superior Court.

On August 20, 1979, petitioner asked our Court to assume plenary jurisdiction over her appeal pending in the Superior Court and her action for declaratory judgment then before the Commonwealth Court. We granted this request on September 21, 1979, consolidated both actions and transferred them to the Commonwealth Court with the directions that an evidentiary hearing be held, that findings of fact be made, and to certify the record to this Court upon the conclusion of the proceedings in order that we might make a final determination of the legal claims advanced. The Commonwealth Court has made an exhaustive analysis of the workings of the Act and has now transmitted the record with its findings to us for our consideration. For the reasons that follow, we must agree with petitioner that the

1. Act of October 15, 1975, P.L. 390, No. 111, §§ 101 *et seq., as amended* by the Act of December 14, 1979, P.L. 562, No. 128, 40 P.S. §§ 1301.101 *et seq.* (Supp.1980–81).

Act has failed in its goal to render expeditious resolution to medical malpractice claims and consequently imposes an oppressive burden upon the right to jury trial guaranteed by our state constitution.[2]

Petitioner Mattos raises three grounds in support of her contention that the Act is unconstitutional. These are:

(1) The arbitration process created by the Act is filled with such interminable delay that it violates the guarantees in the state constitution of access to the courts, justice without delay and the right to jury trials.[3]

(2) By requiring litigants to try a complicated and expensive malpractice action in arbitration prior to being permitted a jury trial, the Act places an onerous and impermissible condition on the right to jury trials.

(3) The Act and its procedures deny medical malpractice victims procedural due process guaranteed by the fourteenth amendment to the United States Constitution because the physician member of the panel has an impermissible financial interest in the outcome of the litigation.

This last issue need not detain us for long. We carefully considered the same challenge to the Act in *Parker* and concluded that the Act fully complied with the basic elements of due process and was not unconstitutional on that account. *See* 483 Pa. at 128–130, 394 A.2d at 943–44. As petitioner Mattos has failed to bring forth persuasive authority to cause us to question our reasoning in *Parker* on this point, we reject her due process challenge and reaffirm our holding in *Parker.*

**2.** Sec. 6. Trial by jury
"Trial by jury shall be as heretofore, and the right thereof remain inviolate."
Pa.Const. art. I, § 6.

**3.** Sec. 11. Courts to be open; suits against the Commonwealth
"All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay. Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct."
Pa.Const. art. I, § 11.

The remaining two issues also were presented to us in *Parker*. Our resolution proceeded upon a two–level approach. First, we found that on the theoretical plane, the Act and its procedures did not violate any guarantees of the constitution. Second, we held that the Act was too new to properly determine whether the Act's actual operation resulted in an unconstitutional infringement upon the right to jury trial. The following portions of our *Parker* opinion will help put today's decision into perspective:

> All of the parties here accept the applicability of the right to jury trial provision of Art. I, section 6 to the instant tort actions thus we need only consider whether there has been such an infringement upon that right, by the legislation in question, as reach constitutional proportions. Under our case law it is clear that our constitutional provision does not require an absolutely unfettered right to trial by jury. In this Court's decision in *Emerick v. Harris*, 1 Binney 416 (1808), Justice Yeates ruled that an increase in the jurisdiction of justices of the peace which caused certain matters which previously required resolution by a jury to be disposed of in a summary proceeding was not violative .of Article I, section 6 since the right of trial by jury was available on appeal, "though the party may be subjected to some inconvenience in making his election." *Id.* at 425. Moreover, it is clear that arbitration as a condition precedent to trial does not, per se, violate Article I, section 6. *Smith's Case*, 381 Pa. 223, 112 A.2d 625 (1955), appeal dismissed, 350 U.S. 858, 76 S.Ct. 105, 100 L.Ed. 762 (1955). In *Smith's Case, supra,* the Court was called upon to consider the constitutionality of a legislative enactment and a rule of court promulgated pursuant to it, which required submission to compulsory arbitration of cases where the sums claimed were under a certain stated amount. In passing upon the legislation's compatibility with the constitutional provision guaranteeing the right of trial by jury that decision stressed:
>
> 'The only purpose of the constitutional provision is to secure the right of trial by jury before rights of persons or

property are *finally* determined.' (emphasis in original text) *Id.*, 381 Pa. at 230, 112 A.2d at 629.

Thus the teaching of *Smith's Case, supra,* instructs us that a legislative requirement that a claimant seek redress through an alternative procedure, e. g. arbitration, in the first instance does not offend Article I, section 6 provided the right to trial by jury is available prior to a final determination of the respective rights of the parties. However, *Smith's Case, supra* further cautioned:

'All that is required is that the right of appeal for the purpose of presenting the issue to a jury must not be burdened by the imposition of onerous conditions, restrictions or regulations which would make the right practically available.' *Id.*, 381 Pa. at 231, 112 A.2d 629.

Appellants herein mold their constitutional objection from this language and contend that malpractice cases are complicated, expensive and difficult to try, and thus a prerequisite which would require two trials imposes in these cases an onerous condition, making the right to trial by jury practically unavailable. The first weakness in appellants position is the assumption that there will necessarily be a need for the second proceeding to obtain a fair recovery for the injured party's loss. The legislative intent was to provide a more expeditious disposition to enable the victim to avoid the interminable delays that all too frequently occur in the regular court process. Nor is there any basis for concluding that the awards rendered in arbitration would not fairly compensate the victim to the full extent to which he or she is entitled. Further, the Act mandates the necessary insurance that virtually assures the satisfaction of the award of damages that are determined to be appropriate. Rather than imposing a burden, this legislation is designed to afford the plaintiff a swifter adjudication of his claim, at a minimal cost and guarantees the satisfaction of the judgment obtained. The Act further discourages dilatory and frivolous appeals by parties by providing for the imposition of all costs of both arbitration and trial, which includes the expenses of

expert witnesses on the losing party if the trial court finds that the basis for the appeal was capricious, frivolous and unreasonable. We are therefore satisfied that any theoretical burden upon the victim's right to trial by jury is counterbalanced by the substantial advantages provided to him or her under the Act and is not the type of 'onerous' restriction alluded to in *Smith.*

We are not here concerned with a question of curtailing a constitutionally conferred right because of the existence of a competing constitutional right or duty. See e. g. *Moore v. Jamieson,* 451 Pa. 299, 306 A.2d 283 (1973). Here it is only the postponement of the availability of the right that is in question. Where the reason for the postponement of the right results from the effort on the part of the state to achieve a compelling state interest and the procedure is reasonably designed to effectuate the desired objective, it cannot be said that there has been a constitutionally impermissible encroachment upon that right. The acceptance in this jurisdiction of arbitration as a viable, expeditious, alternative method of dispute–resolution is no longer subject to question. *Flightways Corp. v. Keystone Helicopter Corp.,* 459 Pa. 660, 662–63, 331 A.2d 184, 185 (1975); *Capecci v. Joseph Capecci, Inc.,* 392 Pa. 32, 139 A.2d 563 (1958); *Children's Hospital of Philadelphia v. American Arbitration Ass'n.,* 231 Pa.Super. 230, 234, 331 A.2d 848, 850 (1974). Nor does the fact that the arbitration here is compulsory rather than voluntary, detract from its usefulness for this purpose. *Smith's Case, supra.* We are therefore satisfied that the precondition of compulsory arbitration in cases of this type does not present the type of 'onerous' restriction which we referred to in *Smith's Case.*

In reaching our conclusion today we are relying upon the legislative judgment that the procedures provided for under the Act will substantially expedite the disposition of malpractice cases in this jurisdiction. We are aware of many instances where arbitration has been used in other areas of dispute–resolution where it has produced signifi-

cant results in expediting the disposition of those matters. The stated purpose of the Act expressly provides as an objective that one who sustains injury or death as a result of the fault of a health car provider "*can obtain a prompt determination of his claim and the determination of fair and reasonable compensation.*" See § 102. In conferring upon the administrator the power to promulgate rules and regulations the General Assembly charged that the power was given to effectuate the purposes of the Act. Appellants have cited statistics which would indicate that the present performance of this procedure has been far from impressive in demonstrating its capacity to provide an expeditious disposition of these cases. Nevertheless the period of time covered by the accumulated data is insufficient to establish either that the legislative scheme is incapable of achieving its stated purposes or that the administrator is unable or unwilling to provide the administration that will insure the prompt and fair resolution promised. It is an accepted principle of constitutional law that deference to a coequal branch of government requires that we accord a reasonable period of time to test the effectiveness of legislation.

'Even where the social undesirability of a law may be convincingly urged, invalidation of the law by a court debilitates popular democratic government. Most laws dealing with economic and social problems are matters of trial and error. That which before trial appears to be demonstrably bad may belie prophecy in actual operation. It may not prove good, but it may prove innocuous. But even if a law is found wanting on trial, it is better that its defect should be demonstrated and removed than that the law should be aborted by judicial fiat.' *American Federation of Labor v. American Sash & Door Co.*, 335 U.S. 538, 553, 69 S.Ct. 258, 265, 93 L.Ed. 222 (1949) (Frankfurter, J., concurring).

483 Pa. at 118–22, 394 A.2d at 938–40 (footnotes omitted).

The defects of the Act have been demonstrated through the findings of the Commonwealth Court after studying its

operation over a period of years. These findings reveal the following facts concerning the failure of the Act to provide an efficacious alternative dispute—resolution procedure:

## STATISTICAL ANALYSIS OF CLAIMS FILED WITH THE ADMINISTRATOR

72. Between April 6, 1976, and December 31, 1979, a total of 2,909 claims were filed with the Administrator under the Act.

73. Of these 2,909 claims, a certificate of readiness or its equivalent was filed in 134 cases.

74. Of the 134 cases in which certificates of their equivalent were filed, the certificate or its equivalent was filed within six months of December 31, 1979 in 40% of the cases, and the certificate or its equivalent was filed within one year of December 31, 1979, in 70% of the cases.

75. Of these 134 cases, 14 were tried before arbitration panels, 23 more were settled during panel selection, and 1 was continued by order of the Commonwealth Court, leaving 96 which have not had a final disposition.

76. Of the 96 cases in which there has been no final disposition, arbitration hearings are scheduled in 7 cases; prehearings have been held or scheduled in 12 cases; panel selections have been underway in 54 cases; and panel selections have been completed in 23 cases.

77. Of the 14 cases which were tried, 13 resulted in verdicts by the panel and one was settled while at hearing.

78. Of the 13 panel verdicts, 8 were verdicts for the plaintiff and 5 were verdicts for the defendant.

79. As of December 31, 1979, 6 of the 13 panel verdicts had been appealed and the 30—day appeal period of a seventh case had not yet expired.

80. One of the cases appealed was disposed of by a court of common pleas, which reached the same result as the arbitration panel.

83. Of the 53 panels selected, 36 had 7 members, 5 had 5 members and 12 had 3 members.

84. For these 53 cases, the average length of time between filing a certificate of readiness or its equivalent ΅nd appointment of a chairperson, is 7.57 months.

85. The average for the same period, for cases in which certificate or its equivalent was filed in 1979, is 5.3 months.

86. Of the 2,909 claims that have been filed, a total of 698 cases were disposed of by means of dismissal, transfer to courts of common pleas, discontinuance, settlement, or *non pros.*

87. Of those 698 cases, 395 were settled with disclosure of the amount of settlement, 9 were settled without disclosure of the amount of settlement, 146 were discontinued without a monetary settlement, 15 were dismissed, 76 were discontinued by issue of *non pros*, and 57 were transferred to courts of common pleas.

88. Of the 2,909 claims that were filed, 176 cases, or approximately 6% of the total cases filed and approximately 28% of the total number of cases in which conciliation conferences were held, were settled, discontinued, or ended following the conciliation conferences.

89. Of the 2,909 claims that have been filed, 48 of these claims were filed in 1976, and 39 of the 48 claims were disposed of as of December 31, 1979.

90. Of the 2,909 claims filed, 422 of those claims were filed in 1977, and 232 of the 422 cases were disposed of as of December 31, 1979.

91. Of the 2,909 claims filed, 1,166 of those claims were filed in 1978 and 311 of the 1,166 claims were disposed of as of December 31, 1979.

92. Of the 2,909 claims filed, 1,273 of those claims were filed in 1979, and 100 of the 1,273 claims were disposed of as of December 31, 1979.

93. Of the 2,909 claims filed, 625 are one–half year old or less.

94. During 1978 and 1979 new cases were filed with the Administrator at the rate of approximately 100 cases per month.

95. There are many cases in the inventory of cases pending under the Act where the amount in controversy is under $10,000.

The basic theme running throughout our opinion in *Parker* was that the Act must be given time to work out its initial problems before our courts should step in and determine its constitutionality.[4] Today, we are satisfied that sufficient time has passed to allow for a meaningful evaluation and must regretably conclude that the lengthy delay occasioned by the arbitration system therein does in fact burden the right of a jury trial with "onerous conditions, restrictions or regulations which . . . make the right practically unavailable." *Id.*, 483 Pa. at 119, 394 A.2d 939, quoting *Smith's* case, 381 Pa. 223, 231, 112 A.2d 625, 629 (1955). Nor can we agree that the actual operation of the Act's arbitration "procedure is reasonably designed to effectuate the desired objective" of affording "the plaintiff a swifter adjudication of his claim, at a minimal cost." 483 Pa. at 120, 394 A.2d at 939.

The findings made by the Commonwealth Court indicate that the arbitration panels provided for under the Act are incapable of providing the "prompt determination and adjudication" of medical malpractice claims which was the goal of the Act. *See* § 102, 40 P.S. § 1301.102. Nor has the arbitration system improved within the last year.[5] Papers

4. The Commonwealth Court's Findings regarding the time when *Parker* was filed reveals that any action taken to strike down the Act would have been premature, considering the Act had been effective for only one year at that point:

CASE LOAD OF THE OFFICE AS OF THE TRIAL DATE IN *PARKER V. CHILDREN'S HOSPITAL OF PHILADELPHIA*

104. As of June 22, 1977, the date of trial in *Parker v. Children's Hospital of Philadelphia*, January Term, 1977, No. 1024 and September Term, 1976, No. 2818, Court of Common Pleas of Philadelphia, a total of 196 complaints had been filed with the Office.

105. At that time, no hearings had been held, but one was scheduled.

106. As of that date, 2 panels had been selected.

107. An additional 13 cases had been disposed of by settlement or discontinuance.

5. Our analysis today includes the effect of the recent amendments to the Act contained in the Act of December 14, 1979, P.L. 562, No. 128, amending sections 308 and 403 of the original Act and adding section

filed with this Court included a statistical analysis of the health care panels up to May 31, 1980. These documents reveal that as of May 31, 1980, a total of 3,452 cases had been filed with the Administrator and that only 936 of these cases had been resolved, settled or terminated. This means that 73 per cent of the cases filed with the administrator have not been resolved. Even worse, six of the original 48 cases filed in 1976 remain unresolved, despite the passage of four years. No extraordinary circumstances have been offered to explain this intolerable delay. Furthermore, as of May 31, 1980, 38 per cent of the claims filed in 1977, 65 per cent of the claims filed in 1978, and 85 per cent of the claims filed in 1979 remain unresolved. Such delays are unconscionable and irreparably rip the fabric of public confidence in the efficiency and effectiveness of our judicial system. Most importantly, these statistics amply demonstrate that "the legislative scheme is incapable of achieving its stated purpose." *See Parker v. Children's Hospital of Philadelphia*, 483 Pa. at 121, 394 A.2d at 940.

█ We are compelled, therefore, to declare unconstitutional section 309 of the Act, 40 P.S. § 1301.309, giving the health care arbitration panels "original exclusive jurisdiction" over medical malpractice claims because the delays involved in processing these claims under the prescribed procedures set up under the Act result in an oppressive delay and impermissibly infringes upon the constitutional right to a jury.

Nothing in this opinion, however, should be taken as a retreat from our long–held belief in "arbitration as a viable, expeditious, alternative method of dispute–resolution." *Parker v. Children's Hospital of Philadelphia*, 483 Pa. at 120, 394 A.2d at 939–40, citing *Flightways Corp. v. Keystone*

1007.1. *See* 40 P.S. §§ 1301.308, 1301.403 (Supp.1980–81). These amendments were intended to expedite the processing of claims filed with the Administrator. They have proven to be, however, far too little far too late. We must conclude that the Act is incapable of achieving its purposes of prompt dispute resolution and that the extensive delays in such resolution cast an impermissible burden upon the constitutional right to a jury trial.

*Helicopter Corp.,* 459 Pa. 660, 662–63, 331 A.2d 184, 185 (1975); *Capecci v. Joseph Capecci, Inc.,* 392 Pa. 32, 139 A.2d 563 (1958); and *Children's Hospital of Philadelphia v. American Arbitration Ass'n.,* 231 Pa.Super. 230, 234, 331 A.2d 848, 850 (1974).

Our conclusion merely indicates the inability of this statutory scheme to provide an effective alternative dispute resolution forum in the area of medical malpractice. Notwithstanding we are confident, as experience has demonstrated, that arbitration is still a viable alternative that can be effective in many areas.

Accordingly, declaratory judgment is granted in favor of petitioner Mattos, the order of the Court of Common Pleas of Northampton County dismissing the complaint in trespass against Dr. Thompson is reversed and this case is remanded to that court for proceedings consistent with this opinion.

LARSEN, J., filed a concurring and dissenting opinion.

ROBERTS, J., filed a dissenting opinion in which EAGEN, C. J., joined.

LARSEN, Justice, concurring and dissenting.

I concur in the result of this case granting declaratory judgment in favor of petitioner Mattos, reversing the order of the Court of Common Pleas of Northampton County and remanding the case to that court. I regret, however, that justice has been so long denied those litigants who have been bogged down in this "unworkable mess",[1] especially those litigants to whom redress in courts has been unnecessarily denied because of the decision of Mr. Justice Nix writing for a majority of this Court in *Parker v. Children's Hospital of Philadelphia,* 483 Pa. 106, 394 A.2d 932 (1978). That denial

---

1. "The Medical Malpractice Act of 1976 is an unworkable mess . . . . It is a piece of social legislation which has not achieved a single one of its purposes. . . . [The] backlog is growing by leaps and bounds each year. . . . The only thing this Act has successfully done is create a bureaucracy which impedes the resolution of disputes by its citizens." *Parker v. Children's Hospital of Philadelphia,* 483 Pa. 106, 132, 394 A.2d 932, 934 (1978) (Larsen, J., dissenting).

of justice was "unnecessary" because, despite overwhelming evidence before it, a majority of this Court did not appreciate the magnitude of the problems inherent in the medical malpractice arbitration system.

Mr. Justice Nix wrote, in *Parker*, that appellants there had "cited statistics which would indicate that the present performance of [the medical malpractice arbitration] procedure has been far from impressive in demonstrating its capacity to provide an expeditious disposition of these cases. Nevertheless, the period of time covered by the accumulated data is insufficient . . ." to establish the failure of the arbitration system or an oppressive burden on the right to a jury trial. 483 Pa. at 121, 394 A.2d at 940 (1978). When *Parker* was decided, this Court was aware that, of 1270 cases filed with the administrator of the Act between January 13, 1976 (the effective date of the Act) and August 31, 1978, only two cases had been disposed of by trial by the arbitration panel. *Id.*, 483 Pa. at 132, 394 A.2d at 945 (Larsen, J. dissenting). (In this regard, Mr. Justice Nix's footnote 4, p. 195, is very misleading in suggesting that this Court had only a one year period to consider when we decided *Parker*. The fact is this Court had before it a *28 month* period to consider from the effective date of the Act to oral argument before this Court (January 13, 1976–May 23, 1978).) In the face of this and similar statistical evidence, Mr. Justice Nix, and the majority of the *Parker* Court, were nevertheless "satisfied" that any burden on the victim's right to jury trial was "theoretical" and that such "theoretical burden" was "counterbalanced by the substantial advantages" provided by the Act. I submit that the burden on the right to a jury trial is no less theoretical, and that the "advantages" of the Act are no greater now, than when we decided *Parker*.

While I am in general agreement with the "accepted principle of constitutional law that deference to a coequal branch of government requires that we accord a reasonable period of time to test the effectiveness of legislation . . .", *Id.*, 483 Pa. at 121, 394 A.2d at 940, I do not believe that "deference" requires sticking one's head in the sand to avoid difficult constitutional problems when confronted with evi-

dence of their existence and magnitude. Deference is one thing—unconscionable delay in rendering justice is, however, inexcusable, whether the source of that delay be the medical malpractice arbitration panel or the courts themselves.

To the extent that the majority opinion upholds the validity of any of the medical malpractice arbitration provisions, I dissent.[2] I would hold *all* of the provisions of the Act dealing with arbitration panels and procedures, namely Articles III, IV and V, to be unconstitutional. I would also, pursuant to this Court's supervisory powers, order all presently pending medical malpractice arbitration cases transferred to the appropriate courts of common pleas with instructions to the courts to give due consideration, in scheduling these cases, to the delay suffered in each case (i. e., to consider when the case was filed, if and when a certificate of readiness had been applied for, whether the parties contributed to the delay, etc.).[2]

ROBERTS, Justice, dissenting.

Judicial patience is a virtue. As this Court admonished in *Parker v. Children's Hospital of Philadelphia,*

> "[t]hat which before trial appears to be demonstrably bad may belie prophecy in actual operation. . . . But even if a law is found wanting on trial, it is better that its defect should be demonstrated and removed than that the law should be aborted by judicial fiat."

483 Pa. 106, 121–22, 394 A.2d 932, 940 (1978), quoting *American Federation of Labor v. American Sash & Door Co.,* 335 U.S. 538, 553, 69 S.Ct. 258, 265, 93 L.Ed. 222 (1949) (Frankfurter, J., concurring). In my view, the Health Care Services Malpractice Act and implementing regulations are entitled to far more judicial patience than the majority is willing to exercise. I dissent.

Unlike the majority, I cannot conclude that "delay" has impermissibly infringed the constitutional right of mal-

2. For additional reasons supporting the unconstitutionality of the Medical Malpractice Act of 1976, *see Parker v. Children's Hospital of Philadelphia,* 483 Pa. 106, 394 A.2d 932 (1978) (Larsen, J., dissenting).

practice plaintiffs to trial by jury. Rather, I share the conclusion of the unanimous Supreme Court of Indiana which rejected a similar challenge to Indiana's Medical Malpractice Act. The Supreme Court of Indiana observed:

"It is quite clear that the Malpractice Act does not take away the right to a jury trial. The right is fully accorded after the delay and expense occasioned by the panel submission requirement. . . .

Delay in the commencement of a trial and the expense of investigating and marshalling evidence are part and parcel of the preparation of any piece of civil litigation. Delay routinely occurs between the decision to prosecute a claim and the trial. Expenses for investigation and preparation attend the pre–trial preparation of all claims. The panel submission requirement generates evidence admissible at a future trial of the claim. The delay in the trial occasioned by this process and the cost attendant to it are in major part like those to be expected in any case. The participation by the parties in the panel processes will satisfy to a great extent their preparation needs. Such satisfaction will tend to reduce total aggregate time for trial preparation. Thus, the delay complained of will be offset to an appreciable extent. The cost to the party in whose favor the opinion is rendered would be in the range that such party would expect to pay to develop such evidence individually. And the . . . party against whom the opinion is rendered has been subjected to a cost by the process which would be much the same as he expects to pay to discover his opponent's evidence. The panel submission requirement does impinge upon the right to trial by jury, but in so doing does not alter or change and does not impair the right contrary to constitutional limitation. The delay and expense complained of does not alter or change the substantial elements and incidents of the jury trial right for either party."

*Johnson v. St. Vincent Hospital, Inc.,* Ind., 404 N.E.2d 585, 592 (1980). Indeed, the majority's contrary conclusion is based on a speculative, arbitrary, and standardless guessing–

game approach which can lead only to unfair future application. Today's line–drawing can only "bring adjudications of this tribunal into the same class as a restricted railroad ticket, good for this day and this train only." *Smith v. Allwright*, 321 U.S. 649, 669, 64 S.Ct. 757, 766, 88 L.Ed. 987 (1944) (Roberts, J., dissenting).*

There can be no denying that Pennsylvania's Malpractice Act has not enjoyed a trouble–free start. In its early years of administration the Act generated no small delay in the resolution of disputes between the ever–increasing numbers of persons dissatisfied with medical services and providers of health care.

It must be remembered however, that "Courts may not declare a statute unconstitutional unless it *clearly, palpably,* and *plainly* violates the Constitution." *Tosto v. Pennsylvania Nursing Home Loan Agency,* 460 Pa. 1, 16, 331 A.2d 198, 205 (1975), quoting *Daly v. Hemphill,* 411 Pa. 263, 271, 191 A.2d 835, 840 (1963). Accord, *In re William L.,* 477 Pa. 322, 383 A.2d 1228, cert. denied, 439 U.S. 880, 99 S.Ct. 216, 58 L.Ed.2d 192 (1978). There is every reason to believe that relief is now here. In December of last year, our Legislature by Act 1979–128 made several significant adjustments of the Malpractice Act. Arbitration panels have been reduced in size from seven members to three. § 308(b). The "strike list" method of selecting panel members has been eliminated. In its stead the Legislature has established a system of Administrator–appointments. § 308(a). Parties' peremptory challenges to panelists have been reduced from six to one. § 308(c). And now if a panel is not selected within ninety days after a certificate of readiness is filed,

---

* Malpractice statutes similar to Pennsylvania's have been sustained against numerous constitutional attacks, including jury trial guarantees, in the following cases: *Attorney General of Maryland v. Johnson,* 282 Md. 274, 385 A.2d 57 (1978); *Comiskey et al. v. Arlen et al.,* 55 A.D.2d 304, 390 N.Y.S.2d 122 (1976); *Eastin v. Broomfield,* 116 Ariz. 576, 570 P.2d 744 (1977); *Everett v. Goldman,* La., 359 So.2d 1256 (1978); *Paro v. Longwood Hospital,* 373 Mass. 645, 369 N.E.2d 985 (1977); *Prendergast v. Nelson,* 199 Neb. 97, 256 N.W.2d 657 (1977); *State ex rel. Strykowski et al. v. Wilkie,* 81 Wis.2d 491, 261 N.W.2d 434 (1978); *Woods v. Holy Cross Hospital et al.,* 591 F.2d 1164 (5th Cir. 1979).

the action shall be transferred to a court of common pleas for disposition. § 403.

This last adjustment is most important. Under newly-promulgated 37 Pa.Code § 171.123(a) of the Act's Administrator, certificates of readiness in both pending and future cases must be filed expeditiously. This regulation provides:

"*Mandatory filing of certificates of readiness.*

(a) In all actions commenced prior to the effective date of this section [(February 12, 1980)], the parties shall file a certificate of readiness within one year after the effective date of this section. In all actions commenced on or after the effective date of this section, the parties shall file a certificate of readiness within one year after the commencement of the action."

This regulation and the amendment directing transfer together assure litigants that within fifteen months of initiation of an action their case will be heard. I therefore cannot subscribe to the majority's conclusion that there has been "too little, too late." Rather, these efforts of not just the Legislature but also the Act's Administrator are, indeed, positive and affirmative measures. These joint efforts of the Legislative and Executive branches of our Government deserve due deference by this, our Judicial branch.

EAGEN, C. J., joins in this dissenting opinion.