475 A.2d 1291

**Martin HELLER, Esquire and Robert F. Simone, Esquire, Appellees,**

v.

**Arthur S. FRANKSTON, Administrator of the Arbitration Panels for Health Care, Appellants.**

Supreme Court of Pennsylvania.

Argued Jan. 24, 1984.

Decided April 18, 1984.

Gwendolyn T. Mosley, Allen C. Warshaw, Andrew S. Gordon, Deputy Atty. Gen., for appellants.

Fred Speaker, Lewis S. Kunkel, Jr., Harrisburg, for amicus curiae.

Harry Lore, Philadelphia, for appellees.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION

NIX, Chief Justice.

Carmello Marquez, a minor, by Dionisia Marquez, his mother and guardian, and Dionisia Marquez in her own

right, filed a complaint with the Administrator for Arbitration Panels for Health Care (Administrator), pursuant to the Health Care Services Malpractice Act (Act), Act of October 15, 1975, P.L. 390, *as amended,* 40 P.S. § 1301.101 *et seq.* At the time of the filing of the complaint in this matter, the arbitration panel had "original exclusive jurisdiction over a claim brought by a patient or his representative for loss or damages resulting from the furnishing of medical services which were or which should have been provided." Section 309 of the Act, 40 P.S. § 1301.309.

Before an arbitration panel was formed, the parties reached a settlement of one million dollars, one-third of the settlement to go to counsel as attorneys' fees. Because a minor was involved in the action, Martin Heller and Robert F. Simone, as counsel for the Marquez family, petitioned the court of common pleas for leave to compromise the action.[1] The court approved the settlement and the attorneys' fees, although the attorneys' fees were in excess of the fees allowed pursuant to section 604(a) of the Act, 40 P.S. § 1301–604(a), which provided that:

(a) When a plaintiff is represented by an attorney in the prosecution of his claim the plaintiff's attorney fees from any award made from the first $100,000 may not exceed 30%, from the second $100,000 attorney fees may not exceed 25%, and attorney fees may not exceed 20% on the balance of any award.[2]

1. Pa.Rule of Civil Procedure 2039(a) provides:
 No action to which a minor is a party shall be compromised, settled or discontinued except after approval by the court pursuant to a petition presented by the guardian of the minor.
 Additionally, the regulations adopted by the administrator pursuant to section 307 of the Act, 40 P.S. § 1301.307, provided:
 *Requirement of Court Approval of Settlements*
 Approval of a settlement involving fiduciaries, minors or incompetent parties by the Administrator or the arbitration panel shall not relieve the parties of obtaining approval by an appropriate court where such is required by the Pennsylvania Rules of Civil Procedure.
 37 Pa.Code, § 171.130, adopted July 1, 1976.

2. We note that the language of section 604(a), regulating counsel fees, was specifically directed to "awards" by the arbitration panels, and

Pursuant to section 307 of the Act, 40 P.S. § 1301.307, the parties also sought the approval of the Administrator,[3] who initially declined to approve the settlement as proposed because the attorneys' fees were greater than those permitted by section 604(a) of the Act.[4] The Administrator subsequently approved that portion of the fee allowed by the Act; however, because Heller and Simone raised a question as to the constitutionality of the attorneys' fees provision, the Administrator ordered that the disputed fees ($110,610.77) be placed into escrow pending final judicial disposition. The Attorney General filed a petition in the court of common pleas by which he sought to modify the court's order approving the settlement and attorneys' fees and granting distribution of the settlement fund.[5] On October 2, 1979, the common pleas court entered an order denying the petition to modify and directed that the disputed attorneys' fees from the escrow account be remitted to appellees.

The Attorney General appealed to the Commonwealth Court, and while that appeal was pending, our Court handed down the decision in *Mattos v. Thompson (Mattos)*, 491 Pa.

did not refer to "settlements". Cf. *Chiesa v. Fetchko,* 318 Pa.Super. 188, 464 A.2d 1293 (1983). The parties, however, have not raised this issue herein.

3. Section 307 of the Act, 40 P.S. § 1301.307(b) read in pertinent part: The administrator shall have the power to consider and approve offers of settlement for fiduciaries, minors and incompetent parties at any time prior to the first meeting of the arbitration panel.

4. We note that there is no question here as to the reasonableness of or the fairness of the attorneys' fees as approved by the court; the sole challenge concerned the fact that the fee exceeded the statutory limit of section 604(a) of the Act.

5. The record is unclear as to whether the Attorney General was acting as counsel for the Administrator or was involved in the case pursuant to Pa.R.A.P. 521(a) which states in pertinent part:
 The Attorney General may be heard on the question of the constitutionality of the statute involved without formal intervention. If the Attorney General files a brief concerning the question the Commonwealth shall thereafter be deemed to be an intervening party in the matter.
 The Attorney General requested that the sum in the escrow account, plus interest, be paid to the guardian of the estate of the injured minor.

385, 421 A.2d 190 (1980). Subsequently, the Commonwealth Court held that the common pleas court did not have jurisdiction to entertain the petition seeking approval of the settlement and attorneys' fees based on its belief that only the Administrator was competent to consider and approve the settlement. *Marquez v. Hahnemann Medical College and Hospital of Philadelphia*, 56 Pa.Commw. 188, 424 A.2d 975 (1981). The Commonwealth Court made only passing reference to *Mattos* and did not address the question as to the effect of that decision on the issue then before the court. *Marquez v. Hahnemann Medical College and Hospital of Philadelphia, supra*, 56 Pa.Cwlth. at 190 n. 1, 424 A.2d at 976 n. 1.

Thereafter, relying on the Commonwealth Court's decision, the Administrator directed the appellees to relinquish the disputed fees. The action of the Administrator was in turn appealed to the Commonwealth Court. That court declared section 604(a) of the Act unconstitutional, finding an impermissible legislative interference with the responsibility of the judiciary. *Heller v. Frankston*, 76 Pa.Commw. 294, 464 A.2d 581 (1983). This appeal is from that decision.

## II.

■ The Commonwealth Court and the parties herein have implicitly assumed the continuing validity of the Act after our decision in *Mattos*. They have framed the question as being whether the attorneys' fees limitation imposed by section 604(a) of the Act constitutes an impermissible interference with judicial authority to supervise the activities of attorneys. However, it is our view that the effect of the holding in *Mattos* was to nullify all of the arbitration procedures of the Act, including section 604(a).

At the outset it is instructive to review the purposes of the Act. The stated objectives were to make available professional liability insurance at a reasonable cost, and to establish a system through which a victim who had sustained injury or death as a result of tort or breach of contract by a health care provider could obtain a prompt

adjudication of his claim and fair and reasonable compensation for the resulting losses. Section 102 of the Act, 40 P.S. § 1301.102. The heart of the scheme designed to effectuate the prompt and the fair dispute resolution was the compulsory arbitration. It is clear that section 604(a) was ancillary to and a component of that arbitration scheme. The Act's other objective of making available professional liability insurance at a reasonable cost was implemented through the establishment of the Medical Professional Liability Catastrophe Loss Fund.[6]

We were first confronted with constitutional challenges to the arbitration system created under the Act in *Parker v. Children's Hospital of Philadelphia,* 483 Pa. 106, 394 A.2d 932 (1978). The focus of our attention then and now was on those provisions relating to the arbitration scheme, Articles III, IV, V, and VI. It was argued, *inter alia,*[7] in *Parker* that the arbitration requirement constituted an impermissibly onerous burden upon the right to trial by jury accorded pursuant to Article I, Section 6 of the Pennsylvania Constitution. We upheld the constitutionality of the Act with the caveat that "deference to a coequal branch of government requires that we accord a reasonable period of ... time to test the effectiveness of the legislation." *Id.,* 483 Pa. at 121, 394 A.2d at 940.

The challenge that the arbitration process created by the Act infringed upon the right to jury was again raised in *Mattos.* By that time experience had demonstrated that the lengthy delays occasioned by the arbitration scheme under

6. Todays decision, as well as the decision of *Mattos* do not consider Articles I, II, VII, VIII, IX, and X of the Act.

7. The other constitutional issues raised in *Parker v. Children's Hospital of Philadelphia,* 483 Pa. 106, 394 A.2d 932 (1978), include whether the Act and its procedures deny medical malpractice victims procedural due process guaranteed by the fourteenth amendment to the United States Constitution because the physician member of the panel has an impermissible financial interest in the outcome of the litigation; and whether the Act places an onerous and impermissible financial condition on the right to jury trials due to the expense of trying a complicated and expensive malpractice action in arbitration prior to having access to a jury.

the Act impermissibly burdened the right of trial by jury so as to render "the right practically unavailable." *Id.* 491 Pa. at 390, 421 A.2d at 195.

The findings made by the Commonwealth Court indicate that the arbitration panels provided for under the Act are incapable of providing the "prompt determination and adjudication" of medical malpractice claims which was the goal of the Act. See § 102, 40 P.S. § 1301.102. Nor has the arbitration system improved within the last year. Papers filed with this Court included a statistical analysis of the health care panels up to May 31, 1980. These documents reveal that as of May 31, 1980, a total of 3,452 cases had been filed with the Administrator and that only 936 of these cases had been resolved, settled or terminated. This means that 73 per cent of the cases filed with the Administrator have not been resolved. Even worse, six of the original 48 cases filed in 1976 remain unresolved, despite the passage of four years. No extraordinary circumstances have been offered to explain this intolerable delay. Furthermore, as of May 31, 1980, 38 per cent of the claims filed in 1977, 65 per cent of the claims filed in 1978, and 85 per cent of the claims filed in 1979 remain unresolved. Such delays are unconscionable and irreparably rip the fabric of public confidence in the efficiency and effectiveness of our judicial system. Most importantly, these statistics amply demonstrate that "the legislative scheme is incapable of achieving its stated purpose."

*Mattos,* 491 Pa. at 395–96, 421 A.2d at 195–96 (footnote and citation omitted).

Despite our repeated statements in *Mattos* declaring the arbitration "system", the arbitration "procedure", the arbitration panels, and the legislative "scheme", to be ineffective and oppressive, it is still being contended that the arbitration system of the Act is viable. However, in *Mattos,* we expressly held:

We are compelled, therefore, to declare unconstitutional section 309 of the Act, 40 P.S. § 1301.309, giving the

health care arbitration panels "original exclusive jurisdiction" over medical malpractice claims, because the delays involved in processing these claims under the prescribed procedures set up under the Act result in an oppressive delay and impermissibly infringes upon the constitutional right to a jury.

. . . . .

Our conclusion merely indicates the inability of this statutory scheme to provide an effective alternative dispute resolution forum *in the area of medical malpractice*.

*Mattos*, 491 Pa. at 396–97, 421 A.2d at 196 (emphasis added).[8]

The fact that reference was made to the "original exclusive jurisdiction" of section 309 over medical malpractice claims does not mean that the unconstitutionality of section 309 refers only to its exclusivity aspect. Rather, since "the legislative scheme was incapable of, achieving its stated purpose", *Parker v. Children's Hospital, supra* 483 Pa. at 121, 394 A.2d at 940, *Mattos* inherently rendered the entire medical malpractice arbitration scheme, not only the exclusivity of jurisdiction, unconstitutional.[9]

Nevertheless, it is argued that *Mattos* should be interpreted as allowing the arbitration panels to retain jurisdiction concurrent with the courts. Official Opinion of the Attorney General No. 80–2, 15 Pa.D. & C.3d 585 (1980). The fallacy underlying the attempts to read *Mattos* narrow-

8. In declaring unconstitutional the arbitration system of the Act, *Mattos* nullified Articles III, IV, V and VI of the Act, which provide the administrative and procedural details relating to the arbitration process.

9. Efforts of my colleague to redefine the meaning of *Mattos,* see Dissenting Opinion of Mr. Justice Hutchinson at 1297 and 1299, fail upon scrutiny. While the dissent makes a valiant attempt to retrieve some power for the Administrator for Arbitration Panels to rule upon attorney's fees, the seminal jurisdictional section 309, vital to any enforcement authority of the Administration for Arbitration Panels, no longer exists. Therefore, the state's power to regulate attorneys' fees may not be exercised through the action of the Administrator for Arbitration Panels.

ly is that that decision only declared the "exclusivity" of the jurisdiction conferred by the Act unconstitutional.

However, we emphasize that in striking down Section 309 we indicated, in the clearest possible language, that the constitutional objection resulted from the arbitration scheme. We did not expressly or implicitly limit our action to the "exclusive" aspect of the panels' jurisdiction. Our holding in *Mattos* rendered invalid the only legislative grant of jurisdiction to the panels. The only body competent to confer a new jurisdictional predicate for the panels would have been the legislature. This the legislature has not done.

■ Moreover, this argument would assume that this Court intended to provide an alternative for the scheme fashioned by the legislature. Where a legislative scheme is determined to have run afoul of constitutional mandate, it is not the role of this Court to design an alternative scheme which may pass constitutional muster. *See Mayhugh v. Coon*, 460 Pa. 128, 331 A.2d 452 (1975); *Glancey v. Casey*, 447 Pa. 77, 288 A.2d 812 (1972); *Cali v. City of Philadelphia*, 406 Pa. 290, 177 A.2d 824 (1962).

■ Under the position taken by the proponents of the post-*Mattos* viability of the arbitration system, we would have been required to substitute concurrent jurisdiction in the place of the exclusive jurisdiction provided by the legislature. This would have been an improper exercise of judicial authority. *See Mayhugh v. Coon, supra; Glancey v. Casey, supra; Cali v. City of Philadelphia, supra*. Not only, as previously stated, is the fashioning of an alternative scheme an inappropriate judicial function, but also the suggested scheme would have been clearly contrary to the legislative expression of public policy. The scheme advocated by those who attempt to distort *Mattos* substitutes concurrent jurisdiction in the panels for exclusive jurisdiction expressly provided by the legislature. There is no doubt that the legislature intended to establish a compulsory scheme of arbitration, an integrated system in which the

arbitration panels had "exclusive original jurisdiction". The exclusivity of the jurisdiction was crucial to the legislative design in that the Act could accomplish its stated purpose of prompt and fair dispute resolution only if the parties were compelled to proceed through the system.

 Since *Mattos,* properly interpreted, did in fact strike down the arbitration process, it necessarily follows that section 604(a) no longer has vitality. While a statute may be partially valid and partially invalid, that can only occur where the provisions are distinct and not so interwoven as to be inseparable. *Saulsbury v. Bethlehem Steel Co.,* 413 Pa. 316, 196 A.2d 664 (1964); *Pennsylvania Railroad Co. v. Schwartz,* 391 Pa. 619, 139 A.2d 525 (1958). The power to regulate counsel fees was ancillary to the power to arbitrate the basic claim. Where the panel has lost the jurisdiction over the resolution of the claim itself it obviously cannot regulate counsel fees in such matters. With our decision in *Mattos* the exclusive original jurisdiction in these cases reverted to the court. Any argument suggesting severability of section 604(a) would be patently erroneous.

Accordingly, the Order of the Commonwealth Court vacating the Order of the Administrator is affirmed.

LARSEN, J., concurs in the result.

HUTCHINSON, J., files a dissenting opinion.

HUTCHINSON, Justice, dissenting.

The majority today not only eliminates the optional, two tier arbitration—court system, but also throws the substantive law governing medical malpractice into confusion and plants doubts as to the continuing viability of the Medical Professional Liability Catastrophe Loss Fund and the statutory procedures for disciplining doctors who fail to meet professional standards. I would not lament the elimination of the arbitration panels we held optional in *Mattos v. Thompson,* 491 Pa. 385, 421 A.2d 190 (1980), if it were done by the body which created these panels as a part of its effort to make professional liability insurance available at a

reasonable cost.[1] However, even if we assume this Court has the right to step in and eliminate the panel system because of its wasteful impracticality, I am unable to follow the majority in its reasoning that the difficulties with arbitration necessarily destroy the substantive control our legislature placed on contingent fees in Section 604 of the Act. The majority reaches out to these results in spite of the fact that the only issue briefed and argued before this Court was the constitutionality of a single section of the Health Care Services Malpractice Act, Section 604, on the ground that it violates separation of powers under Article V, Section 10(c) of our Pennsylvania Constitution. This constitutional provision grants us power to regulate the practice of law.[2] The issue presented to us was not due process or the ineffectiveness of the arbitration system. It was the power of the legislature reasonably to control legal fees.

The majority opinion avoids treating the conflict between coordinate branches this issue poses. It does so, however, by casting into confusion the status of other substantive sections of the Health Care Services Malpractice Act. Those other sections directly implement the legislature's

1. Act of October 15, 1975, P.L. 390, § 102, 40 P.S. § 1301.102 (Health Care Services Malpractice Act).

2. Article V, Section 10(c) provides:

The Supreme Court shall have the power to prescribe general rules governing practice, procedure and the conduct of all courts, justices of the peace and all officers serving process or enforcing orders, judgments or decrees of any court or justice of the peace, including the power to provide for assignment and reassignment of classes of actions or classes of appeals among the several courts as the needs of justice shall require, and for admission to the bar and to practice law, and the administration of all courts and supervision of all officers of the Judicial Branch, if such rules are consistent with this Constitution and neither abridge, enlarge nor modify the substantive rights of any litigant, nor affect the right of the General Assembly to determine the jurisdiction of any court or justice of the peace, nor suspend nor alter any statute of limitation or repose. All laws shall be suspended to the extent that they are inconsistent with rules prescribed under these provisions.

This Court, in paraphrasing this language, has repeatedly added the word, "exclusive". I note, again, that the word, "exclusive", is not contained in the text. That being the case, I would think considerations of comity would stay our hand in this case.

over-all goal of meeting what it and the medical profession saw as a health care crisis. That crisis arose out of the high cost of medical malpractice insurance and the prospect of its absolute unavailability as insurers threatened to withdraw from that field, contending they could not safely write such insurance even at ever-spiraling rates. One of the legislature's substantive creations is the Catastrophe Loss Fund for excess coverage. Presumably, the majority does not find the Constitution requires its elimination. However, its opinion in this case does not address the effect that removal of the fee limitation will have on the Catastrophe Loss Fund.[3]

The practical problems incident to the inefficient and wasteful arbitration system are indeed serious. Hindsight shows this procedural system was unwise. Its problems cannot, however, obscure the fact that the majority's result destroys the General Assembly's substantive effort to reasonably regulate legal fees and, incidentally, carves out a privileged status for the legal profession.

On February 7, 1976, Dionisia Marquez's son, Carmello, was treated in a Philadelphia Hospital for bronchopneumonia. As a result of that treatment, or lack of it, the child suffered severe brain damage. He now requires twenty-four hour care and should be adjudged an incompetent. Opinion of the Administrator, February 3, 1981, p. 2. Carmello's mother sought legal representation from a Philadelphia attorney. She apparently signed a contingent fee agreement which provided for an attorney's fee amounting to a flat thirty-three percent of the plaintiffs' recovery, notwithstanding the express limitation on attorneys' fees in malpractice cases. Section 604 of the Act,[4] limits such fees

---

3. The Medical Professional Liability Catastrophe Loss Fund, created in Articles VI and VII of the Act, provided $800,000.00 of the $1,000,-000.00 settlement in this case. Record, Order of Paul F. Abrams, Administrator, Arbitration Panels for Health Care, p. 2, January 11, 1978.

4. Act of October 15, 1975, P.L. 390, § 604, 40 P.S. § 1301.604, effective January 13, 1976.

by a scale with a high of 30% and a low of 20%, depending on the amount of recovery.

On August 13th, 1976, counsel filed a complaint with the Arbitration Panels for Health Care in the City of Philadelphia. Late in 1977, the defendants and their insurers agreed to pay one million dollars in settlement of the Marquez's claims. Eighty per cent of this amount was paid by the Catastrophe Loss Fund created by other provisions of this Act. See note 4, *supra*. Plaintiff's counsel then submitted that settlement for approval by the Philadelphia Court of Common Pleas instead of first submitting it to the Administrator as provided by Section 307(b) of the Health Care Services Malpractice Act, 40 P.S. § 1301.307(b).[5] *See Marquez v. Hahnemann M.C.*, 56 Pa. Commonwealth Court 188, 424 A.2d 975 (1981).

Philadelphia Common Pleas approved the settlement on December 15, 1977 and authorized attorneys' fees in the amount of $333,333.00. Thereafter, counsel submitted the settlement to the Administrator who approved the settlement among the parties on January 11, 1978, but directed counsel to hold in escrow the $110,610.77 [6] which exceeded the statutory limit on fees, pending a final judicial determination whether plaintiffs or their counsel were entitled to

**5.** Section 307 of the Act was amended on July 15, 1976, effective immediately and retroactive to January 13, 1976, as follows:

(b) The administrator shall have the power to consider and approve offers of settlement for fiduciaries, minors and incompetent parties at any time prior to the first meeting of the arbitration panel. The fund may be represented at any negotiation of settlement exceeding the basic coverage insurance carrier limit of liability.

37 Pa.Code § 171.130 was promulgated by the Administrator effective July 10, 1976. 6 Pa.B. 1632. It read:

Approval of a settlement involving fiduciaries, minors or incompetent parties by the Administrator or the arbitration panel shall not relieve the parties of obtaining approval by an appropriate court where such is required by the Pennsylvania Rules of Civil Procedure.

This regulation was subsequently amended and renumbered in 1979. *See* 9 Pa.B. 3811 (November 17, 1979).

**6.** Record, Order of Paul F. Abrams, Administrator, Arbitration Panels for Health Care, p. 2, January 11, 1978.

these funds. At the request of plaintiff's attorney a Certificate of Discontinuance was issued on January 5, 1978.

Subsequently, the Administrator filed a petition with the Philadelphia Court of Common Pleas seeking a modification of the order which had approved the thirty-three percent attorney's fee. Common Pleas denied the petition and directed release of the escrowed funds to plaintiffs' counsel. The Administrator then appealed to Commonwealth Court. That court vacated the lower court order, holding that courts have "jurisdiction over minors' settlements *only after* an appeal has been effected under the provisions of Section 509 of the Act, 40 P.S. § 1301.509, and the case has . . . for the first time come within the jurisdiction of the court." *Marquez v. Hahnemann, supra.* 56 Commonwealth Ct. at 195, 424 A.2d at 979 (footnote omitted).

Although *Marquez v. Hahnemann* was decided four months after our opinion in *Mattos v. Thompson, supra,* Commonwealth Court did not fail to recognize that *Marquez* was originally and properly filed under the arbitration system and settled under the then constitutional provisions of the Act. *Parker v. Children's Hospital of Philadelphia,* 483 Pa. 106, 394 A.2d 932 (1978). *Mattos,* moreover, held only that Section 309 of the Act, 40 P.S. § 1301.309, was unconstitutional because, in giving the health care arbitrator panels "original exclusive jurisdiction" over medical malpractice claims, "the delays involved in processing these claims under the prescribed procedures set up under the Act result in an oppressive delay and impermissibly infringes [sic] upon the constitutional right to a jury." *Mattos,* 491 Pa. at 396, 421 A.2d at 196. I do not quarrel with that decision.

The Marquez's claim was filed, settled and discontinued less than two years after the child was injured and more than three years before this Court decided *Mattos.* *Mattos* did not address Section 307 and the authority it gives to the Administrator "to consider and approve offers of settlement for fiduciaries, minors and incompetent parties at any time

prior to the first meeting of the arbitration panel." 40 P.S. § 1301.307(b).

Rebuffed in Commonwealth Court, plaintiff's counsel attempted in 1981 to transfer his three year old discontinued case to the court of common pleas. This attempt was rejected by the Administrator. Counsel then appealed to Commonwealth Court directly challenging the constitutionality of Section 604 of the Act.[7] That Section sets forth the limitations on attorneys' fees in the following language:

7. Counsel's challenge, based on Pennsylvania Constitution Article V, Section 10(c), would cast into question a host of fee limitations enacted by the General Assembly in other areas, among them:

(a) Pennsylvania statutes limiting attorney's fees in cases based on causes of action that previously existed at common law include: Motor Vehicle Sales Finance Act, Act of June 28, 1947, P.L. 1110, as amended Act of July 1, 1978, P.L. 725, No. 130, 69 P.S. § 623 (Supp. 1983–84) (relating to limitation of $50 for attorney's fees prior to commencement of legal action for repossession); Act of January 30, 1974, P.L. 13, No. 6, 41 P.S. § 406 (Supp.1983–84) (relating to limitation of $50 for attorney's fees prior to commencement of foreclosure or other legal action); Act of January 30, 1974, P.L. 13, No. 6, 41 P.S. § 503 (Supp.1983–84) (relating to determination of reasonable attorney's fees when borrower, residential mortgage debtor, or other debtor prevails); Home Improvement Finance Act, Act of August 14, 1963, P.L. 1082, 73 P.S. § 500–209 (relating to home installment contracts, collection of delinquencies, payment of court costs and attorney's fees not exceeding 20% of amount due); Act of June 22, 1964, P.L. 84, § 610, added by Act of December 29, 1971, P.L. 640, No. 169, 26 P.S. § 1–610 (Supp.1983–84) (relating to reimbursement for owners of any rights, titles or interest in real property, with attorney's fees not to exceed $500).

(b) Other Pennsylvania statutes limiting attorney's fees include: Pennsylvania No-fault Motor Vehicle Insurance Act, Act of July 19, 1974, P.L. 489, No. 176, 40 P.S. § 1009.107 (Supp.1983–84) (relating to limiting reasonable attorney's fees to that based on actual time expended on behalf of a claimant); Pennsylvania No-fault Motor Vehicle Insurance Act, Act of July 19, 1974, P.L. 489, No. 176, 40 P.S. § 1009.602 (Supp.1983–84) (relating to misdemeanor for charges for legal fees in excess of amount authorized by Pennsylvania No-fault Motor Vehicle Act); Act of December 15, 1959, P.L. 1774, No. 672, 53 P.S. § 7445 (relating to attorney's fees of 5% for collection of liens for municipal improvement); Act of June 19, 1913, P.L. 535, as amended Act of April 9, 1915, P.L. 67, 53 P.S. § 53402 (relating to attorney's fees of 5% for collection of assessments for municipal grading, paving, or curbing of public highways); Adoption Act, Act of October 15, 1980, P.L. 934, No. 163, as amended Act of June 23, 1982, P.L. 617, No. 174, 23 Pa.C.S.A. § 2313 (relating to limitation of attorney's fee to $150 for representing child in involuntary termination proceeding); The Work-

(a) When a plaintiff is represented by an attorney in the prosecution of his claim the plaintiff's attorney fees from any award made from the first $100,000 may not exceed 30%, from the second $100,000 attorney fees may not exceed 25%, and attorney fees may not exceed 20% on the balance of any award.

(b) A plaintiff has the right to elect to pay for the attorney's services on a mutually satisfactory per diem basis. The election, however, must be exercised in written form at the time of employment.

40 P.S. § 1301.604.

In determining that Section 604 of the Act, 40 P.S. § 1301.604, is not severable from the now unconstitutional sections of Articles III, IV and V, the majority does not mention Section 1925 of the Statutory Construction Act, 1 Pa.C.S. § 1925 which provides:

The provisions of every statute shall be severable. If any provision of any statute or the application thereof to any

men's Compensation Act, Act of June 2, 1915, P.L. 736, as amended Act of March 29, 1972, P.L. 159, No. 61, 77 P.S. § 998 (Supp.1983–84) (relating to limitation of attorney's fees to 20% of amount awarded); Act of May 16, 1923, P.L. 207, 53 P.S. § 7271 (Supp.1983–84) (relating to assessment of 5% fee for collection to plaintiff's attorney in municipal judgment on claims); Act of May 16, 1923, P.L. 207, 53 P.S. § 7187 (relating to limitation of plaintiff's attorney's fees to 5% up to $50 for collection of tax and municipal claims); The Administrative Code, Act of April 9, 1929, P.L. 177, as amended Act of July 9, 1976, P.L. 574, No. 139, 71 P.S. § 180–7.2 (Supp.1983–84) (relating to award of attorney's fees to crime victims in an amount not to exceed 15%); Act of December 13, 1982, P.L. 1127, No. 257, 71 P.S. § 2032 (Supp.1983–84) (relating to attorney's fees for administrative agency actions of not more than $75 per hour—none if total less than $250, no more than $10,000); Credit Union Act, Act of September 20, 1961, P.L. 1548, as amended Act of December 14, 1982, P.L. 1240, No. 283, 15 P.S. § 12319 (relating to limitation to 20% of outstanding loan balance for attorney's fees); The First Class Township Code, Act of June 24, 1931, P.L. 1206, as amended Act of May 31, 1955, P.L. 56, No. 27, 53 P.S. 56513 (relating to 5% attorney's commission on assessments for street lighting); The Second Class Township Code, Act of May 1, 1933, P.L. 103, No. 69, as amended Act of July 11, 1980, P.L. 575, No. 120, 53 P.S. § 65702 (Supp.1983–84) (relating to 5% attorney's commission on assessments for street lighting); The Second Class Township Code, Act of May 1, 1933, P.L. 103, No. 69, as amended Act of May 20, 1949, P.L. 1562, No. 474, 53 P.S. § 65743 (relating to 5% attorney's commission on assessments for police protection).

person or circumstance is held invalid, the remainder of the statute, and the application of such provision to other persons or circumstances, shall not be affected thereby, unless the court finds that the valid provisions of the statute are so essentially and inseparably connected with, and so depend upon, the void provision or application, that it cannot be presumed the General Assembly would have enacted the remaining valid provisions without the void one; or unless the court finds that the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.

For the reasons which follow I do not find Section 604 essentially or inseparably connected with the now voided provisions of the Act. Neither do I find that Section 604 standing alone is either incomplete or incapable of execution in accordance with the legislative intent.

The Health Care Services Malpractice Act was enacted in 1975 for the purpose of making

*available professional liability insurance at a reasonable cost,* and to establish a system through which a person who has sustained injury or death as a result of tort or breach of contract by a health care provider can obtain a prompt determination and adjudication of his claim and *the determination of fair and reasonable compensation.*

40 P.S. § 1301.102 (emphasis added). The title of the Act specifically describes the discrete subjects it addresses: "medical and health malpractice insurance", "powers and duties of the Insurance Department"; "a joint underwriting plan"; "Arbitration Panels for Health Care, compulsory screening"; "collateral sources requirement"; "limitation on contingent fee compensation"; "establishing a Catastrophe Loss Fund"; "penalties". It is evident from the title that the legislature intended to construct a multifaceted program to insure the availability of professional liability

insurance at reasonable cost,[8] combining provisions: for particular powers and duties of the Insurance Department, for the joint underwriting plan, for the collateral source requirements, for the limitation on contingent fee compensation, for the establishing of a Catastrophe Loss Fund and for the imposition of penalties, in addition to the creation of arbitration panels to achieve that goal.

In a similar fashion, the structure of the Act demonstrates the several distinct areas the legislature sought to address. Article II sets forth the liability of non-qualifying health care providers. Articles III, IV and V create the arbitration panels and the office of Administrator. Article VI deals with awards. It contains six sections. Only two refer to arbitration panels. The other sections of this Article deal with: (a) the reduction of awards by any public collateral source of compensation or benefits and the denial of subrogation, (b) attorney's fees from *any* award, (c) the statute of limitations on the liability of the Catastrophe Loss Fund established in Article VII and (d) the requirement of a special contract in writing to create a guaranty of cure. Article VII creates the Medical Professional Liability Catastrophe Loss Fund and provides for the liability of excess carriers. Article VIII requires the Insurance Commissioner to create a plan, consisting of all insurers authorized to write insurance under The Insurance Company Law of 1921, Act of May 17, 1921, P.L. 682, 40 P.S. § 382 *et seq.*, which would "provide equitable apportionment of the financial burdens of insurance provided to all applicants ... and the costs of operation of the plan among all participating insurers...." Article IX directs the Medical, Osteopathic and Podiatry licensing boards to appoint investigators, attorneys and hearing examiners to fully implement their authority to revoke, suspend, limit or otherwise regulate the licenses of physicians. Finally, Article X contains six mis-

---

8. We note that the title to the Act of January 30, 1974, P.L. 13, § 101, 41 P.S. § 101, which sets forth the maximum lawful interest rate for loans and mortgages contains a parallel list including "provision for the payment of attorney's fees with regard to residential mortgage obligations".

cellaneous provisions for immunity from liability for the licensing boards, requiring notice prior to cancellation of professional liability policies, establishing the act's prospective application only, setting forth penalties for non-payment of assessments and establishing a joint committee.

Given this panoply of legislative devices designed to address the medical malpractice insurance crisis in 1975, I do not see how it can now be said either that the entire act is unconstitutional because the arbitration panels are unworkable, or that the section controlling fees is so tied in with the arbitration system that the legislature would not have included it if it had not created the arbitration system. Judged by the standards of 1 Pa.C.S. § 1925,[9] neither our original conclusion in *Mattos* that the jurisdiction of arbitration panels is not exclusive, nor today's revision of *Mattos,* nullifying all of the arbitration procedures of the act, provides any basis for a judicial excision of the limitation on contingent fee compensation in Article VI. The language in Section 604, 40 P.S. § 1301.604, refers to "a plaintiff represented by an attorney in the prosecution of his claim" and limits plaintiff's attorneys fees from "any award". There is no reference to arbitration panels anywhere in this section.

Plaintiff's counsel has argued that the legislature's authority to limit attorney's fees applies only to statutory claims, not to actions derived from common law. I believe his argument is without merit. The legislature has for almost two centuries enacted statutes setting fees for attorneys-at-law. Admittedly, most of these statutes were enacted as measures to guarantee an attorney a minimum fee, as for example the Act of February 22, 1821, P.L. 50, 7 Sm.L. 367, § 2, 17 P.S. § 1635 (1962), entitled "An Act to alter and amend the fee bill", which entitled an attorney-at-law to receive $3.00 for every suit" prosecuted to judgment, discontinuance, or non pros" and $1.50 for "issuing praecipe for the commencement of any suit, entering an appearance on the prothonotary's docket, if the suit is ended on or before the first day of the first term." The Act of June 11,

**9.** *Supra,* p. 10.

1885, P.L. 107, § 1, 12 P.S. § 3000 (1952) entitled "A Supplement to an Act entitled 'an Act to prevent vexatious attachments, and to regulate the costs thereof,' approved April twenty-second, one thousand and sixty three," did, however, specify "a reasonable counsel fee, not exceeding ten dollars".

> Where, in any attachment, execution or scire facias on foreign attachment issued out of any court of record in this state, the garnishee shall be found to have in his possession or control no real or personal property of the defendant, nor to owe him any debt, the said garnishee shall be entitled to recover from the plaintiff, in addition to the costs already allowed by law, a reasonable counsel fee, not exceeding ten dollars, to be determined by the court and taxed as part of the costs.

12 P.S. § 3000 (1952).

While the particular acts cited have been repealed by the legislature in the Judicial Act Repealer Act, Act of August 28, 1978, P.L. 202, effective June 27, 1978, 42 P.S. §§ 20001–20004, [88] and [733], the Laws of Pennsylvania still provide for limits on attorney's fees: (a) in actions for repossession of a motor vehicle, derived from the old action of replevin,[10] (b) in foreclosure actions,[11] and (c) in actions on a mortgage,[12] to name only a few. Even the Judicial Code itself regulates the manner of negotiating a contingent fee in a personal injury case. 42 C.P.S. § 7102. I find no basis in law or logic for concluding that common law torts are somehow beyond the reach of legislative policy. If Article V, Section 10(c) itself requires this distinction, that issue should be faced.

Counsel's equal protection argument that Section 604 discriminates against plaintiff's attorneys by limiting con-

---

**10.** Act of June 28, 1947, P.L. 1110, as amended, Act of July 1, 1978, P.L. 725, 69 P.S. § 623 (1983–84 Supp.). *See* note 8, *supra.*

**11.** Act of January 30, 1974, P.L. 13, 41 P.S. § 406 (1983–84 Supp.). *See* note 8, *supra.*

**12.** Act of January 30, 1974, P.L. 13, 41 P.S. § 503 (1983–84 Supp.). *See* note 8, *supra.*

tingent fee awards must also fall. The profession, including the bench and bar, well knows what the legislature also knows, that defense counsel almost never make contingent fee agreements with their clients, much preferring to be compensated in relation to their time and effort expended. The latter form of compensation is also open to the plaintiff's bar where practical. *See* 40 P.S. § 1301.604(b), *supra,* at p. 1300. Of course, contingent fees are often necessary for the protection of individuals under our legal system. The question here, however, is not their elimination, but their reasonable regulation.

Commonwealth Court evoked the doctrine of "separation of powers" in its opinion to support a holding that the legislature lacks any authority to set attorney's fees. It seems strange that this argument has never been applied to statutes which guarantee a reasonable minimum fee or some other professional perquisite. Separation of powers is not just a mechanism to be dragged out on occasion to protect special interests or the prerogatives of a particular branch of government. It is a coherent policy underlying all American constitutional theory. It requires the courts actively to protect the prerogatives of all three branches of our government, not supinely to permit the aggrandizement of one branch, or one profession, at the expense of the other two. Article V, Section 10(c) of the Pennsylvania Constitution gives this Court "the power to prescribe general rules governing, practice, procedure and the conduct of all courts ... including the power to provide ... for admission to the bar and to practice law, ... *if* such rules are consistent with this Constitution and *neither abridge, enlarge nor modify* the *substantive rights of any litigant."* (Emphasis added). I would find it inconceivable that the right of a litigant to a greater or lesser proportion of his recovery should be viewed as a matter of procedure and thus outside the realm of legislative policy.

The majority of the Court has in this instance avoided the shoals of a dubious distinction between the legislature's authority over common law and statutory fees and the siren

song of "separation of powers". Its opinion should not, however, lead to the jettisoning of the whole Health Care Services Malpractice Act, Administrator, Catastrophe Loss Fund and all.

Since *Mattos*, properly interpreted, did in fact strike down the arbitration process, it necessarily follows that section 604(a) no longer has vitality. While a statute may be partially valid and partially invalid, that can only occur where the provisions are distinct and not so interwoven as to be inseparable. *Saulsbury v. Bethlehem Steel Corp.*, 413 Pa. 316, 196 A.2d 664 (1964); *Pennsylvania Railroad Co. v. Schwartz*, 391 Pa. 619, 139 A.2d 525 (1958).

The power to regulate counsel fees was ancillary to the power to arbitrate the basic claim. Where the panel has lost the jurisdiction over the resolution of the claim itself it obviously cannot regulate counsel fees in such matters. With our decision in *Mattos* the exclusive original jurisdiction in these cases reverted to the court. Any argument suggesting severability of section 604(a) would be patently erroneous.

Majority Opinion at p. 538.

I suggest that Section 1925 of our Statutory Construction Act requires severance. 1 Pa.C.S. § 1925, quoted at p. 1300, *supra.*

The record in this case shows that the basic claim was settled under the then constitutional arbitration program established by statute in 1975. The Marquez's claim was filed with the Administrator in 1976, settled in 1977 and discontinued at the request of counsel in January of 1978. Thus, the 1980 decision in *Mattos* should not be read to create an exclusive original jurisdiction in the Philadelphia Court of Common Pleas at a time when this Court had explicitly found the Health Care Services Malpractice Act and its procedures to be constitutional. *Parker, supra.*

Rather than address the single issue presented to this Court: the legislature's power to set limits on attorneys' fees as part of a broad program to remedy a perceived financial crisis for the providers of health care, the majority

has resorted to a revisionist exegesis of its own cases to bring down the fee limitation in the ruin of the arbitration system [13] and undermine the foundations of the Health Care Services Malpractice Act itself.

13. It is worth noting that this Court has recently approved a local regulation issued by the Philadelphia Court of Common Pleas, imposing a similar two-tier system on the settlement of asbestosis claims. *Pittsburgh Corning Corporation v. Bradley*, 499 Pa. 291, 453 A.2d 314 (1982). I am not yet ready to conclude that such arbitration systems are constitutional when established by judicial fiat, but unconstitutional when enacted by the legislature in accordance with the provisions of Article III of the Pennsylvania Constitution.